# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

| | |
|---|---|
| AMC EAST COMMUNITIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SUNDT CONSTRUCTION, INC.,<br><br>Defendant. | Civil Action No. TDC-17-3598 |

## MEMORANDUM OPINION

Plaintiff AMC East Communities, LLC ("AMC") has filed suit against Defendant Sundt Construction, Inc. ("Sundt") alleging claims for breach of contract and breach of warranty stemming from alleged construction defects in a home manufactured by Sundt. Sundt has filed a Motion for Summary Judgment in which it asserts that AMC's breach of contract claim fails because AMC was not a party to the original construction contract, and its breach of warranty claim fails because it was filed outside the statute of limitations period. AMC opposes the Motion. Having reviewed the submitted materials, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Sundt's Motion for Summary Judgment will be GRANTED, and AMC's claims will be DISMISSED WITH PREJUDICE.

## BACKGROUND

In 2002, Sundt entered into a contract with the United States Government through the United States Department of the Air Force ("Government" or "Air Force") for the construction of houses on various Air Force bases ("the Sundt Contract"). The Sundt Contract, No. F41622-02-D-0001, is signed by a representative of the Air Force and a representative of Sundt. It contains

no provision relating to the potential assignment of the contract. The Sundt Contract incorporates a number of provisions of the Federal Acquisition Regulations ("FAR"), 48 C.F.R. §§ 1.000–53.300 (2018), including a standard provision on Warranty of Construction, which provides that a contractor warrants that its work "is free from any defect in equipment, material, or design furnished, or workmanship performed," and that the warranty "shall continue for a period of 1 year from the date of final acceptance of the work," or, "if the Government takes possession of any part of the work before final acceptance," for one year from the date the Government takes possession. 48 C.F.R. § 52.246-21(a), (b).

In December 2003, as part of the Sundt Contract, planning began for home construction on Andrews Air Force Base ("Andrews AFB") in Maryland. One portion of that project was to build homes on Columbus Circle, a street within Andrews AFB. The Columbus Circle construction was designated project TG-21. On June 19, 2007, after the completion of construction, Sundt provided the Air Force with a letter constituting its final inspection report for the Columbus Circle homes. That letter reiterated that Sundt warrantied its work for a period of one year. As relevant here, the letter stated that the warranty for the home located at 1114 Columbus Circle ("the Property") began on June 19, 2007 and would expire on June 19, 2008. In its Complaint, AMC asserts that the Property was "transferred and accepted by the U.S. on August 28, 2007," which would result in a warranty period ending one year after that date. Compl. ¶ 6, ECF No. 2.

On November 20, 2007, AMC East LLC ("AMC East") and the Government created AMC East Communities, LLC, the Plaintiff in this action, by executing a Limited Liability Company Operating Agreement ("Operating Agreement"). The Operating Agreement states that AMC was created for the purpose of transferring residential properties on certain Air Force bases, including the Property, to a private entity which would develop, manage, maintain, and operate the properties

as rental units for military personnel and other eligible tenants. By the terms of the Operating Agreement, the Government and AMC East are each 50 percent members of AMC, with equal voting rights. The Operating Agreement makes no mention of Sundt or the Sundt Contract.

AMC was to undertake these management functions in accordance with the terms of a Lease of Property ("the Lease"), also dated November 20, 2007, between the Government and AMC. The Lease states that, in order to privatize the management of base housing, the Government was granting to AMC a lease to various land on certain Air Force bases, and certain improvements to that land were to be conveyed to AMC by quitclaim deed. The Lease states that premises are conveyed to AMC in an "AS IS, WHERE IS" condition. Lease ¶ 3.1, Sundt Mot. Summ. J. Ex. D, ECF No. 37-7. The Lease references the Sundt Contract, in the context of a different project, TG-26, which had not been completed at the time the Lease was executed. The Lease provides that "[e]ach time the Government accepts completed MILCON Units in accordance with the terms of the Sundt Contract," the Government will provide written notice to AMC that the unit is "ready to be conveyed 'as is, where is' to [AMC]." Id. at 4.

On November 20, 2007, consistent with the Lease, the Government conveyed the Columbus Circle homes to AMC by quitclaim deed ("the Deed"). The Deed reiterates that the properties were conveyed in an "'AS IS' and 'WHERE IS' condition without representation, warranty, or guarantee as to quality, quantity, character, condition, size or kind or that the same is in a condition or fit to be used for the purpose for which intended." Deed at 1, AMC Opp'n Mot. Summ. J. Ex. 7, ECF No. 49-2.

Also on November 20, 2007, the Air Force and AMC executed an Assignment and Assumption of Guaranties and Warranties ("Warranty Assignment"). The Warranty Assignment states that the Air Force has entered into certain construction contracts with Sundt for the building

of military housing, and that those contracts "include provisions for certain warranties, guaranties and indemnities to be issued thereunder." Warranty Assignment at 1, Sundt Mot. Summ. J. Ex. E, ECF No. 37-8. The Warranty Assignment further states that "the Air Force intends to convey the family housing units at Andrews to AMC, and in connection therewith the Air Force desires to assign, and AMC desires to assume, all rights under the warranties and guaranties" under the contracts. *Id.* Warranties is defined to include "all guaranties and warranties now existing or to come into existence hereafter" related to the Sundt Contract. *Id.* Pursuant to that assignment, AMC became "solely responsible for enforcing the terms of the Warranties directly against Sundt." *Id.* at 2. However, the Air Force retained "all applicable obligations to Sundt" under the Sundt Contract. *Id.* at 1. Sundt expressly consented to the Warranty Assignment in an addendum stating that "with respect to all Warranties issued by, through, or under [Sundt], AMC shall be permitted to make claims directly against [Sundt]." *Id.* at 5. The warranties covered by the Warranty Assignment consist of the Warranty of Construction pursuant to 48 C.F.R. § 52.246-21 and the manufacturer warranties for mechanical, interior-electric, plumbing, and lock fixtures; the insulation; the roof; the flooring; the appliances; and termite treatment.

On October 15, 2015, while a contractor was performing maintenance on the Property, his foot fell through the floor. Later investigation revealed extensive water damage to the substructure of the home, including the joists on which the home rests. AMC asserts that this water damage was the result of improper construction methods, specifically the failure to install a rim joist. Because the area where the rim joist should have been installed was covered by vinyl siding, AMC contends that the construction error could not have been discovered earlier.

On August 25, 2017, AMC filed suit against Sundt and the Sundt Companies, Inc. in the Circuit Court for Prince George's County, Maryland, alleging claims for breach of contract and

4

breach of warranty. The case was removed to this Court on December 4, 2017 on the basis of diversity jurisdiction, 28 U.S.C. § 1332 (2012). The claims against the Sundt Companies, Inc. have since been dismissed, so the sole remaining Defendant is Sundt.

## DISCUSSION

In its Motion for Summary Judgment, Sundt contends that AMC cannot, as a matter of law, succeed on either of its two claims. As to the breach of contract claim, Sundt asserts that AMC is not a party to the Sundt Contract and thus cannot show that it is in privity with the Government for purposes of that contract, such that it lacks standing to sue for breach of contract. As to the breach of warranty claim, Sundt asserts that AMC's claims have been filed outside the warranty period and the statute of limitations. In opposing the Motion, AMC asserts that it may assert a breach of contract claim because it is in privity with the Government for purposes of the Sundt Contract or that, at a minimum, there are disputed issues of material fact as to its right to sue under the contract. As to its breach of warranty claim, AMC asserts that its claim is not time-barred because the time period for filing suit did not begin unitl the date it discovered the breach.

**I.  Legal Standard**

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing

law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

## II. Breach of Contract

As an initial matter, AMC asserts that there are material disputes of fact that preclude resolution of the breach of contract claim on summary judgment. In particular, AMC contends that there are portions of the Sundt Contract that Sundt has yet to disclose. These missing portions are subsections of the FAR and are thus available through any law library or legal research online database. The Court has consulted these clauses and found that they do not contain language relevant to the issues in this case.

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001). "The original rule of the common law was that privity between the plaintiff and the defendant is requisite to maintain an action on a contract." *Mackubin v. Curtiss-Wright Corp.*, 57 A.2d 318, 320 (Md. 1948). Here, the contract that serves as the basis for AMC's breach of contract claim is the Sundt Contract, entered into by the Government and Sundt. The parties do not dispute that AMC is not an original party to the Sundt Contract. However, they dispute whether AMC is in privity with the Government such that it can sue Sundt for breach of the Sundt Contract. AMC asserts that it is the successor to the Government for purposes of the Sundt Contract and traces that status to the collection of November 20, 2007 documents between either the Government and AMC East or the Government and AMC. The Court accordingly examines the Warranty Assignment, the Lease, the Deed, and the Operating Agreement to determine what, if any, contract rights were assigned to or received by AMC.

In Maryland, courts follow "the law of objective contract interpretation, which provides that the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding." *Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232 (Md. 2013) (internal citations omitted). Thus, "a contract's unambiguous language will not give way to what the parties thought the contract meant or intended it to mean at the time of execution." *Id.* A court must therefore seek to "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Id.*

In interpreting contract language, "the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used." *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 546 (Md. 2003). "[T]he contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Dumbarton Improvement Ass'n*, 73 A.3d at 232–33 (quoting *Sagner v. Glenangus Farms, Inc.*, 198 A.2d 277, 283 (Md. 1964)).

AMC's argument that the Government assigned AMC its rights under the Sundt Contract is primarily based on the Warranty Assignment, in particular the language stating that the Government "desires to assign, and AMC desires to assume, all rights under the warranties and guaranties under or relating to the [Sundt Contract]." Warranty Assignment ¶ C, Sundt Mot. Summ. J. Ex. E, ECF No. 37-8. However, by its plain terms, this language assigns to AMC only the Air Force's rights relating to warranties and guaranties and makes no mention of any contract rights. The ordinary meaning of this provision thus provides no basis to conclude that in assigning

its warranty rights, the Government was assigning to AMC all of its contract rights under the Sundt Contract. Indeed, to the extent that the Warranty Assignment expressly references contract rights, it is to specifically carve out certain contractual obligations from the scope of the assignment, providing that "the Air Force shall retain all applicable obligations to Sundt" under the Sundt Contract. *Id.*

This interpretation is bolstered by the remaining language in the Warranty Assignment, which elsewhere defines the "Assignment" as a transfer of all of the Air Force's "right, title and interest" in "the Warranties." *Id.* ¶ 3. "Warranties," in turn, is defined as "any and all guaranties and warranties now existing or to come into existence hereafter under or relating to the [Sundt Contract]," including the FAR Warranty of Construction and others specifically listed in the Warranty Assignment, as well "as any and all indemnities set forth" in the Sundt Contract "in favor of the Air Force, directly or indirectly." *Id.* ¶ 2. As to indemnifications, the Sundt Contract contains none relevant to AMC's claims. No mention is made in these provisions of a general assignment of contract rights under the Sundt Contract. Further, although the Warranty Assignment gives AMC the right, indeed the responsibility, to sue Sundt directly, that right is expressly one to "enforc[e] the terms of the Warranties directly against Sundt." *Id.* ¶ 5.

Where the plain language of the Warranty Assignment limits the assignment to warranties, guaranties, and indemnities, grants to AMC the right to enforce only those provisions, and references contract rights under the Sundt Contract only to exclude certain rights from the scope of the assignment, the Court concludes that the Warranty Assignment did not designate AMC as the successor to the Government for purposes of the Sundt Contract or otherwise assign all of the Government's contract rights under that the Sundt Contract to AMC. *See* Restatement (Second) of Contracts § 328 (Am. Law. Inst. 1981) ("Unless the language or the circumstances indicate the

8

contrary ... an assignment of 'the contract' or of 'all my rights under the contract' ... is an assignment of the assignor's rights and a delegation of his unperformed duties under the contract."); *Dumbarton Improvement Ass'n*, 73 A.3d at 232–33.

The terms of the Lease underscore this conclusion. Although the Lease makes mention of the Sundt Contract, it does not do so to transfer contract rights from the Government to AMC. Referring to another housing development on Andrews AFB that had yet to be completed, the Lease states that the completed homes will be conveyed to AMC only after "the Government accepts completed MILCON Units in accordance with the terms of the Sundt Contract." Lease ¶ 1.3.1.1. The Lease thus does not contemplate that AMC will step into the shoes of the Government for purposes of the Sundt Contract but instead expressly states the opposite: the Government, not AMC, will continue to perform contractual obligations under the Sundt Contract, specifically, acceptance of residential units, and AMC's interest in any particular property will begin only after the Government fulfills that contractual requirement.

The Lease further provides that when a residential unit is transferred by the Government to AMC, it is done in an "AS IS, WHERE IS" condition. Lease ¶ 3.1. The Lease therefore provides that AMC's rights as to the condition of any particular residential unit were not co-extensive with the Government's contract rights under the Sundt Contract, including the right to residential units meeting "applicable contract quality and quantity requirements." 48 C.F.R. § 46.501 (incorporated into the Sundt Contract); *see Sy-Lene of Wash., Inc.*, 829 A.2d at 546 (stating that "the court will give effect to [contract language's] plain, ordinary, and usual meaning, taking into account the context in which it is used"). Read in its entirety, the Lease does not designate AMC as the successor to the Government for purposes of the Sundt Contract or otherwise assign the

Government's rights under that Contract to AMC. *See Dumbarton Improvement Ass'n*, 73 A.3d at 232.

The Deed and the Operating Agreement are similarly unhelpful to AMC. The Deed reiterates that AMC took possession of the Property in "AS IS" and "WHERE IS" condition and thus reiterates that AMC's rights in the Property are not co-extensive with the Government's rights under the Sundt Contract. Deed at 1. The Operating Agreement makes no mention of the Sundt Contract or any assignment of rights under that contract and thus did not convey any such rights to AMC. Restatement (Second) of Contracts § 328.

Nevertheless, AMC maintains that, as an equitable matter if not as an express contractual one, it is the Government's successor-in-interest as to the Sundt Contract, relying on *Crown Oil & Wax Company of Delaware, Inc. v. Glen Construction Company of Virginia, Inc.*, 578 A.2d 1184 (Md. 1990), in which the Court of Appeals of Maryland held that, under certain circumstances, an entity can be deemed the successor to a party to a contract based on an equitable assignment of the contract rights, even in the absence of an express assignment. *Id.* at 1193–94. In *Crown Oil*, Ed Joy and another investor (collectively, "Joy") purchased a company, Crown Oil & Wax Company of Delaware, Inc. ("Crown"), in order to develop a hotel on land owned by Crown. *Id.* at 1185. To that end, Joy secured a Quality Inn franchise agreement. *Id.* Joy created Frederick Hotel Limited Partnership ("FHLP"), to which the franchise rights were transferred, and secured a construction loan with FHLP listed as the borrower and Crown as the property owner. *Id.* at 1186. Crown then entered into a ground lease with FHLP, under which FHLP leased the land for purposes of "building, owning, and operating" the hotel. *Id.* at 1187, 1192. Crown also entered into a construction contract with Glen Construction Company ("Glen Construction") to build the hotel. *Id.* at 1186–87. At times, the payments made to Glen Construction were made with checks

from an account in the name of FHLP. *Id.* at 1187. When Crown terminated the construction contract, Glen Construction filed a demand for arbitration. *Id.* Crown responded on behalf of both Crown and FHLP, and Glen Construction then sought to enjoin FHLP from participating in the arbitration because it was not a party to the construction contract. *Id.* at 1187–88.

On these facts, the court held that FHLP was the successor to Crown for purposes of the construction contract. *Id.* at 1192. It held that Crown had "at least equitably assigned its benefits under the construction contract" to FHLP because "[a]ny words or *transaction(s)* which show an intention on one side to assign, and on the other side to receive ... will operate as an effective equitable assignment." *Id.* at 1192 (citation omitted). In particular, the court noted that the terms in the ground lease, stating that "[t]he development of the Project, and its construction, ownership and operation shall be at the sole cost and expense of [FHLP]" and that FHLP "does hereby indemnify and hold [Crown] harmless from any and all claims . . arising out of the construction, ownership, or operation of the Project," either constituted an express assumption by FHLP of Crown's obligations under the construction contract, or, together with the "entire transaction," had effected an "implied assumption" of Crown's obligations by FHLP. *Id.* at 1192–93. In concluding that FHLP had become the successor to Crown and that there was "an equitable assignment of the contract owner's rights to, and an assumption of the owner's obligations by, FHLP," the court also relied on the fact that "there was continuity in management for the owner of the hotel project" and that the equitable assignment was not detrimental to Glen Construction's rights. *Id.* at 1193–94.

Here, however, there is no provision in any of the various agreements between the Government and AMC comparable to FHLP's agreement in its ground lease to take on the cost of the construction project and to indemnify Crown against all claims arising from its obligations relating to the construction, terms that revealed that FHLP had stepped into the shoes of Crown

11

for purposes of the construction contract. Rather, the agreements between the Government and AMC place clear and express limits on the rights and obligations flowing from the Government to AMC. In particular, the Warranty Assignment explicitly states that the Government retains "all applicable obligations to Sundt" under the Sundt Contract, and that Sundt agrees that "AMC shall have no liabilities or obligations" such that Sundt "shall not seek to enforce or otherwise hold AMC liable for any obligations" under the Sundt Contract. Warranty Assignment at 1, 5. The fact that the Air Force explicitly made a limited, and not complete, assignment of rights and obligations to AMC belies the notion that such a complete assignment could have been accomplished implicitly. Likewise, the fact that the Lease transferred the residential units from the Government to AMC "as is, where is," is inconsistent with a conclusion that the Government had implicitly provided AMC all of its rights and obligations under the Sundt Contract. Lease ¶ 3.1. Thus, rather than contemplating a broad assignment of the Government's rights under the Sundt Contract, the various agreements show that the Government instead limited the rights and obligations transferred.

In light of these provisions, the Court is unconvinced that, as in *Crown Oil*, the entire transaction could be deemed to have impliedly assigned the Government's contract rights to AMC. Unlike in *Crown Oil*, where Crown and FHLC were controlled and managed by the same individuals and had been largely interchangeable prior to the construction contract with Glen Construction, AMC was not essentially an alter ego of the Government for purposes of the Sundt Contract. Instead, it was an entity created after the Sundt Contract was executed and the Property was built and accepted by the Government, for the purpose of managing the residential units. While the *Crown Oil* court concluded that "FHLP took Crown Inc.'s place by agreeing that the construction costs would be its sole responsibility," and noted that FHLP had made payments to

Glen Construction under the contract, AMC took no responsibility for making payments to Sundt and performed no required obligations under the Sundt Contract. *See Crown Oil*, 578 A.2d at 1194. Particularly where the ownership of AMC included new, private interests unconnected to the Government, and AMC's role as manager of the residential units was substantially different from the Government's role in the Sundt Contract, the Court concludes that the entire transaction cannot be construed as having implicitly assigned all of the Government's rights under the Sundt Contract to AMC and installed AMC as the Government's successor on that contract.

The Court therefore concludes, as a matter of contract interpretation, that each of the November 2007 agreements is clear, unambiguous, and definite, and that none of them assigned to AMC the Government's contract rights under the Sundt Contract. *Dumbarton Improvement Ass'n*, 73 A.3d at 232. Nor was there an implied or equitable assignment of such rights. Accordingly, AMC was not owed a contractual obligation upon which to base its breach of contract claim. *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001). Sundt will be granted summary judgment on this claim.

### III. Breach of Warranty

Sundt contends that AMC's breach of warranty claim is time-barred. In Maryland, any action for breach of warranty as to real property must be "commenced within two years after the defect was discovered or should have been discovered or within two years after the expiration of the warranty, whichever occurs first." Md. Code Ann., Real Prop. § 10-204(d) (2012). Here, AMC discovered the alleged breach in October 2015 and filed suit within two years of discovery, in August 2017. However, the Property was covered by a general Warranty of Construction, contained in the FAR, which lasted for one year from the date of final acceptance of the construction, or, if the Government took possession prior to final acceptance, the date the

Government took possession. *See* 48 C.F.R. § 52.246-21(b). According to Sundt, the Property was finally accepted by the Government on June 19, 2007, such that the warranty expired on June 19, 2008. Although AMC disputes that there was final acceptance on June 19, 2007, AMC's own allegations in the Complaint state that the Property was "transferred and accepted by the U.S. on August 28, 2007." Compl. ¶ 6. The general warranty thus expired by no later than August 28, 2008, giving AMC until August 28, 2010 to file suit, regardless of when the alleged defect was discovered. Md. Code Ann., Real Prop. § 10-204(d). The breach of warranty claim is therefore time-barred.

AMC's claim that *Lumsden v. Design Tech Builders, Inc.*, 749 A.2d 796 (Md. 2000), provides that the limitations period runs from the date of discovery of the breach, is unpersuasive. In *Lumsden*, the court was presented with the question whether discovery of the damage, or discovery of the cause of that damage, was the trigger for the running of the statute of limitations and held that the discovery of damage alone started the clock. *Id.* at 798, 805. The *Lumsden* court was not presented with, and thus did not address, the issue presented here—when the statute of limitations begins to run if the damage is discovered only after the warranty and its associated statute of limitations have elapsed. *See id.* at 804 n.5. The result in such an instance is squarely answered by the language of the statute, under which AMC's breach of warranty claim is time-barred. Sundt's Motion for Summary Judgment will be granted as to this claim.

**IV.    Motion to Amend the Complaint**

Because the breach of contract and breach of warranty claims have been resolved on summary judgment, the rulings are grounded in legal determinations, and AMC has had a full opportunity to present all relevant facts on these issues, the Court finds no basis to permit amendment on these causes of actions. *See U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F. 3d

312, 320 (4th Cir. 2010) (stating that when any alteration to a cause of action would be "futile" and have "no impact on the outcome of the motion to dismiss," the district court need not grant leave to amend). To the extent that AMC has an alternative cause of action, it may file a Motion for Leave to Amend the Complaint within **14 days** of the date of the Order on the Motion. Any such Motion must not only explain why such amendment is not futile, but also provide justification for the failure to seek to amend earlier in the case. *See Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (stating that leave to amend should be denied "when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.").

## CONCLUSION

For the reasons set forth above, Sundt's Motion for Summary Judgment will be GRANTED and AMC's claims will be DISMISSED WITH PREJUDICE. A separate Order shall issue.

Date: February 14, 2019

THEODORE D. CHUANG
United States District Judge